1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2    Including Professional Corporations
   POLLY TOWILL, Cal. Bar No. 120420
3  ptowill@sheppardmullin.com
   ANDRE J. CRONTHALL, Cal. Bar No. 117088
4  acronthall@sheppardmullin.com
   333 South Hope Street, 43rd Floor
5  Los Angeles, California 90071-1422
   Telephone:  213.620.1780
6  Facsimile:   213.620.1398

7  Attorneys for Plaintiff
   BofI FEDERAL BANK
8

9              UNITED STATES DISTRICT COURT

10             SOUTHERN DISTRICT OF CALIFORNIA

11

| 12 | BofI FEDERAL BANK, a federal savings bank, | Case No. 3:15-cv-2353-BAS-NLS |
|---|---|---|
| 13 | Plaintiff, | **DECLARATION OF JONATHAN BALL SUBMITTED IN SUPPORT OF PLAINTIFF BofI FEDERAL BANK'S MOTION FOR PRELIMINARY INJUNCTION** |
| 14 | v. | |
| 15 | CHARLES MATTHEW ERHART, an individual; and DOES 1-25, inclusive, | |
| 16 | Defendants. | Date:   February 1, 2016 Courtroom 4B (Schwartz Courthouse) |
| 17 | | The Hon. Cynthia Bashant |
| 18 | | **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

# DECLARATION OF JONATHAN BALL

I, JONATHAN BALL declare as follows

1. I have personal knowledge of the facts set forth herein. I am currently represented by independent counsel from the law firm of Foley & Lardner LLP. This declaration is for use in federal litigation with respect to which BofI Federal Bank ("BofI") is a party. BofI may also rely on this declaration in connection with internal decisions by BofI. The facts below are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.

## Education & Work History

2. I graduated from San Diego State University with a BS degree in finance in 1991. After college, I worked as a teller at La Jolla Bank for approximately six months until I was promoted to the position of auditor in 1992. I led the audit department at La Jolla Bank for eighteen years until approximately March 2010. I then began employment as an auditor at BofI. After a few months at BofI, I was promoted to Vice President-Internal Audit. I worked at BofI as its Vice President-Internal Audit until March 5, 2015.

3. I have over twenty-two years of experience directing internal audit departments for financial institutions.

## Internal Audit Department at BofI

4. As Vice President-Internal Audit at BofI, my job responsibilities included managing the Internal Audit Department, and implementing the Internal Audit Plan as approved by the Audit Committee of BofI's Board of Directors (the "Audit Committee"). Just prior to leaving BofI, my team was comprised of five internal auditors. As a best practice, I reported directly to the Audit Committee except with respect to administrative matters. For administrative matters I reported

1  to John Tolla.  The Audit Committee is a subcommittee of the Board of Directors
2  and is comprised of outside directors.

3  5.       BofI's Internal Audit Plan was risk focused and supported by
4  applicable risk assessments techniques.  The Audit Plan was annually approved by
5  the Audit Committee. The Audit Committee also monitored the progress of the
6  annual Audit Plan at regularly scheduled Audit Committee meetings.

7  6.       I understood that the role of the Internal Audit Department was to
8  test, monitor, and report on BofI's internal controls, and to conduct such special
9  projects as may from time to time be assigned or approved by the Audit Committee.
10  The Internal Audit Department was required to work in conformance with BofI's
11  Internal Audit Plan as determined by, and under the oversight and direction of, the
12  Audit Committee.

13  7.       Charles Matthew Erhart ("Mr. Erhart") was a junior auditor and one
14  of my Staff Internal Auditors from September 2013 through my last day, March 5,
15  2015.  I was Mr. Erhart's direct supervisor.  Mr. Erhart's primary job duty was to
16  complete audits of various aspects of BofI's operations, including Sarbanes Oxley
17  testing that I assigned to him and supervised him on.

## Resignation from BofI

8.       On March 5, 2015, I sent an email to the Audit Committee and senior management to advise them that I was resigning from BofI effective that same day. A significant reason for my resignation was due to burnout caused by continuous long hours.  My immediate resignation was due, in part, to a discussion I had on March 5th with BofI's CEO, Mr. Garrabrants, about completing time-intensive work tasks facing my department, which I understood would mean no relief from such long hours in the foreseeable future.  I resigned on March 5th and did not return to the offices thereafter.  Within the next week, I did, however, meet telephonically with the Audit Committee in order to provide them with information about, among

-2-

other things, some open items in process in the Internal Audit Department so that the Audit Committee could follow up on these open items. I also spoke with representatives of the Office of the Comptroller of the Currency ("OCC") after I left BofI, but I do not recall the contents of that conversation. I do recall accurately answering the OCC's questions.

## Mr. Erhart's Federal Action Against BofI

9. I read through the Complaint Mr. Erhart filed against BofI on or about October 13, 2015, in the United States District Court for the Southern District of California (the "Complaint"), Case No. 15CV2287-BAS-NLS. I have personal knowledge with regard to several allegations in the Complaint, including the following:

## Mr. Erhart's Allegations in paragraphs 9-16 concerning alleged issues regarding "The Structured Settlements and Lottery Audit"[1]

10. I assigned the Structured Settlements and Lottery Audit to Mr. Erhart, and I supervised his work. Due to the sample technique utilized, loss of some recorded data, and the inability to discuss phone conversations with prior employees, and even assuming that the California statute pertaining to the recording of calls applies to a federally chartered financial institution, of which I am uncertain, I determined that there was not enough evidence to conclude that BofI was recording customer calls potentially in violation of a California statute that pertains to recording of calls. As a result, our final audit report did not include findings that BofI recorded calls in violation of the California statute.

---

[1] In discussing my knowledge with respect to Mr. Erhart's allegations, I am referring to the allegations that Mr. Erhart alleged in his Complaint filed on October 13, 2015, in the United States District Court for the Southern District of California, defined above.

-3-

DECLARATION OF JONATHAN BALL

### Mr. Erhart's Allegations in paragraph 17 concerning alleged "Potentially Altered Financials"

11.       I was present at the meeting referenced by Mr. Erhart in his Complaint at Paragraph 17.  I heard what Mr. Constantine said, which is paraphrased in Paragraph 17 of the Complaint.  I did not interpret Mr. Constantine's comments to mean that BofI was falsifying financial data.  Instead, I understood the comments to mean that Mr. Constantine's job duties with respect to the financials were limited to submission of information for which his division was responsible to the office of the Chief Financial Officer.  It was a discussion focused on job duties, not fraud.

### Mr. Erhart's Allegations in paragraph 18 concerning alleged "Untimely Contributions of Employee 401K Elective Deferrals"

12.       While I was in charge of the Internal Audit Department, I recall that the Internal Audit Department reviewed BofI's 401K contributions to employees as part of a Payroll Audit.  The Internal Audit Department made findings that some of the contributions were delayed, and I submitted the findings to the Audit Committee in the normal course of business.  At the time, I spoke with CFO Andrew Micheletti about whether BofI would elect to self-report the problem to a government agency.  He indicated that BofI would not do so, and we looked together at the authority that permitted this approach.  I thought this was proper.

### Mr. Erhart's Allegations in paragraphs 19-21 concerning alleged issues surrounding the approval of the Fiscal 2015 Strategic Plan

13.       I do not know when the Board of Directors finally approved the Fiscal 2015 Strategic Plan.  Moreover, I do not recall receiving the document that Mr. Erhart described in paragraph 21 of the Complaint titled, "Action by Unanimous Written Consent of the Board of Directors in Lieu of a Meeting."

## Mr. Erhart's Allegations in paragraphs 22-24 concerning alleged "Deposit Concentration Risk Findings"

14.     In late 2014 or early 2015, Mr. Erhart was concerned with BofI's deposit concentration risk and brought this to my attention. I spoke with BofI's Chief Risk Officer, Tom Williams, who I knew used to work for the federal reserve to discuss and understand the issue. Mr. Williams told me that the Federal Reserve had recently completed its audit at BofI and made no findings. Mr. Williams was comfortable with the deposit concentrations in light of the Federal Reserve's recent audit. His comfort made me comfortable as well. I resigned from BofI before I had a chance to further review Mr. Erhart's concern.

## Mr. Erhart's Allegations in paragraph 25 concerning Plaintiff's allegedly "Downgraded Performance Evaluation and Bonus"

15.     In or about December 2014, I evaluated Mr. Erhart's work performance and drafted the Management section of his performance evaluation. I believed that Mr. Erhart usually produced well-evidenced audits and completed his assigned Sarbanes Oxley testing as scheduled. Some of Mr. Erhart's audits were not completed timely. I thought that one of the contributing factors for Mr. Erhart's past due audits was the untimely responses given by the business units to Mr. Erhart's email requests. I encouraged Mr. Erhart in his review to seek face-to-face meetings with the business units to expedite the audit process when necessary.

16.     In addition, Mr. Erhart would at times deviate from the established Audit Plan and would jump to conclusions before completing the audit process.

17.     In or about mid-December 2014, I provided John Tolla, who was BofI's SVP Audit & Compliance, my draft evaluation of Mr. Erhart. He decided to add a few things to Mr. Erhart's performance review resulting in a lower evaluation.

18.     Ultimately, I did not feel that Mr. Tolla's changes to Mr. Erhart's performance review were unacceptable, and I signed the final December 2014 performance review. I stood behind Mr. Erhart's final December 2014 performance

review at the time. However, I brought the issue of Mr. Tolla's involvement with finalizing Mr. Erhart's performance review to the attention of the Audit Committee for their consideration. I resigned my position at BofI before the next Audit Committee meeting took place so I do not know how this issue was resolved by the Audit Committee.

19. After I had finalized and signed Mr. Erhart's December 2014 Performance Review, I met with him to go through it with him. I perceived that Mr. Erhart was displeased with his evaluation and the fact that Mr. Tolla had moved down his evaluation.

**Mr. Erhart's Allegations in paragraphs 26-31 concerning BofI's alleged response to a SEC Subpoena**

20. In or about January 2015, I assigned Mr. Erhart the Right to Financial Privacy Audit. I had read a news article about Elm Tree, which I thought was related to ETIA LLA, and the article suggested that Elm Tree was involved in some kind of securities fraud. I do not recall why I knew, but I recall that I knew that BofI made a loan to someone affiliated with Elm Tree. Mr. Erhart told me that while conducting this audit, he found a subpoena that the SEC had sent to BofI in the course of its investigation of an entity known as "ETIA LLC," and requesting information regarding customers associated with an account bearing a specified routing number and account number. From talking with Mr. Erhart, he told me that he noticed that BofI had responded to the subpoena by saying that BofI had no responsive information.

21. Nevertheless, to follow up regarding the SEC subpoena and the loan, I instructed Mr. Erhart and another junior auditor to speak with someone from the Loan Department. Mr. Erhart reported to me that the Loan Department staff member showed Mr. Erhart and the other junior auditor the relevant loan file. The loan file was relevant to ETIA LLC, but not responsive to the SEC subpoena.

Accordingly, due to the confidential and protected nature of records and loan information held by a financial institution such as BofI, I determined that any further work on this issue should be handled by the Legal Department rather than the Internal Audit Department.

22.     Later, I found out from Mr. Erhart that he called the SEC about BofI's subpoena response.  I had not instructed him to do so, and I would not have recommended this action without fully investigating the issue first and consulting with BofI's lawyers.  Had he discussed his desire to call the SEC, I would have not permitted this because such calls should be made by BofI's lawyers, not someone from Internal Audit.

**Mr. Erhart's Allegations in paragraph 32 concerning BofI's alleged "Failure to Disclose Accounts with No Tax Identification Numbers"**

23.     The issue Mr. Erhart raises in paragraph 32 concerns deposit accounts, not the loans identified by Mr. Erhart; as far as I can recall, I do not believe that the Internal Audit Department was tasked at the time with investigating this issue.

**Mr. Erhart's Allegations in paragraph 34 concerning BofI's alleged "Failure to Disclose Loans to Criminals, Politically Exposed Persons"**

24.     In late 2014 or early 2015, I assigned Mr. Erhart to aid another staff member with the Loan Origination Audit.  The expanded scope of this audit included a review of the underwriting of Asset Depletion Loans.  One of the expanded procedures was to ensure that if a loan was made to a "politically exposed person" (PEP), that the identification of the PEP was properly documented in the loan file.  Mr. Erhart advised me that during the course of the audit, Mr. Erhart found instances of loans that appeared to be made to PEPs.  Mr. Erhart informed me that in those instances there was no documentation in the loan file to support that the

borrower was identified as a PEP prior to loan funding. I do not know whether this documentation in fact existed. I learned from Mr. Erhart that he also reported his findings to the BSA manager. It was my understanding that making a loan to a PEP is not per se improper[2]. I resigned from my position at BofI before Mr. Erhart completed this audit.

### Mr. Erhart's Allegations in paragraph 35 concerning the alleged "Materially Altered Bank Secrecy Act QC Findings" by Mr. Tolla

25. On one or more occasions, Mr. Tolla added his own suggestions and edits to the Bank Secrecy Act Quality Control Report. The area of checking on compliance with the Bank Secrecy Act fell directly under Mr. Tolla's authority. Mr. Tolla did not make any substantive changes to this quality control report, and I do not recall that any of his edits were material. I reviewed all of Mr. Tolla's edits, and I agreed with and signed the final version of that Bank Secrecy Act Quality Control Report.

### Mr. Erhart's Allegations in paragraph 36 that, allegedly, "BOFI Improperly Accounts for Allowances for Loan and Lease Losses"

26. While I was employed at BofI, BofI split review of the Allowances for Loan and Lease Losses (ALLL) between its outside financial auditors and the Internal Audit Department. The outside financial auditors reviewed and audited the financials while the Internal Audit Department ensured that all loans were addressed and that BofI had calculated the numbers correctly in the sense that the numbers added up and there were not mathematical errors in the total. The Internal Audit

---

[2] I am using the term "improper" in this declaration to mean any action that is a material violation of an internal BofI rule or policy or a violation of any state or federal law.

-8-

DECLARATION OF JONATHAN BALL

Department was not the department within BofI that was ultimately responsible for accounting treatment policies. This authority resided elsewhere.

### Mr. Erhart's Allegations in paragraphs 37-39 concerning alleged "Material Omissions in Flood Disaster Protection Act Audit"

27. In approximately 2014, I tasked Mr. Erhart with completing the Flood Disaster Protection Act Audit ("Flood Audit"). I knew that a Compliance Department staff member had already drafted a preliminary list of issues associated with her Flood Review. I instructed Mr. Erhart, as a starting point, to utilize the Compliance Department staff member's draft list of preliminary issues. However, because significant time had passed since she drafted the preliminary list of findings, management had already corrected many of the findings by the time Mr. Erhart finished working on the Flood Audit. In accordance with standard audit procedure, Mr. Erhart and I attended audit exit meetings with the relevant business unit to discuss these preliminary findings. Consistent with what we learned at these meetings, we deleted many of the findings from the initial draft list of preliminary findings because they had been properly remediated or were inaccurate. The final Flood Audit report did contain findings and a plan for remedial action, and to my knowledge no material information was purposely withheld.

28. Given how the Flood Audit had transpired, the Internal Audit and Compliance Departments decided to utilize outside auditors to create a second, more succinct Flood Audit report. I resigned from my position at BofI before the auditors completed this audit.

### Mr. Erhart's Allegations in paragraphs 40-43 concerning the alleged "Global Cash Card Reviews for High Risk Customers"

29. I learned that in late 2014 or early 2015, BofI decided to terminate its contractual relationship with Global Cash Card (GCC). I was present when Mr.

1  Tolla told members of the Internal Audit Department, and others present, to refrain
2  from bringing up the GCC situation with the OCC.  While I do not have a clear
3  recollection, I think that Mr. Tolla indicated that if asked about the issue, the person
4  should refer the regulators to Mr. Tolla for a response.  The Internal Audit
5  Department had already concluded its Prepaid Card Audit, and I believed that the
6  final audit report was accurate.  Because BofI's relationship with GCC was ending, I
7  did not see a need to pursue this issue further.  I do not recall if this was one of the
8  topics I discussed with the Audit Committee during my last telephone briefing in
9  March 2015.

### Mr. Erhart's Allegations in paragraphs 44-45 concerning alleged "Improprieties in the CEO's Personal Accounts"

30.         The Internal Audit Department reviewed employee bank accounts on a quarterly basis, and the specific accounts to review were chosen at random.  I assigned Mr. Erhart to the employee account review for the period of the 4th Quarter 2014.  Mr. Erhart took a random sample of employee accounts, which included a personal account of the CEO of BofI, Mr. Garrabrants.  I recalled that Mr. Garrabrants's account had been selected several years before in a previous employee account review, and the auditor had already reported the issue in the prior review to the Audit Committee that Mr. Garrabrants had deposited third party beneficiary checks into his account.

31.         I resigned from BofI before Mr. Erhart completed this review.

### I resigned from my position at BofI before Mr. Erhart completed this review.  Mr. Erhart's Allegations in paragraphs 47-48 concerning an alleged "Threat to Plaintiff" by Mr. Tolla

32.         On or about the week of January 26, 2015, Mr. Erhart told me that Mr. Tolla had threatened him, which I understood from Mr. Erhart was non-physical in some manner.  I responded that if Mr. Erhart had any concerns, I would bring them to the attention of the Audit Committee.  Mr. Erhart declined my offer.

-10-

### Mr. Erhart's Allegations in paragraph 49 concerning BofI's alleged refusal "To Let Employees Communicate Via Outlook (Email)"

33.     In or about early 2015, Mr. Tolla emailed me and other members of the Internal Audit Department to inform us that BofI planned to switch from Outlook to Jabber for future communications.  I am not familiar with the capabilities of Jabber.  My first concern was that the switch to Jabber might make the job of the Internal Audit Department more difficult because in the audits, the auditors sometimes use emails from the Outlook system as substantive evidence.  At that time, I did not know the capabilities, archiving, or accessibility of Jabber so I did not know if the needs of the Internal Audit Department would be addressed by the move to Jabber.  Although BofI installed Jabber on my computer, I never stopped using Outlook during my employment at BofI.  I had access to Outlook until my departure on March 5, 2015.

### Mr. Erhart's Allegations in paragraph 50 concerning my alleged resignation "After Refusing to Break the Law"

34.     I did not resign "after refusing to break the law." No one at BofI, including Greg Garrabrants, Eshel Bar-Adon, John Tolla, Tom Constantine, Andrew Micheletti, or any member of the Audit Committee ever instructed me to break the law.  In addition, I was never instructed to hide any uncovered violations in audits.

35.     There was nothing unusual about my scheduling an Audit Committee meeting in February 2015.

//
//
//
//
//
//

## Conclusion

36. While working at BofI, there were a few occasions when I disagreed with the actions or approach of other senior BofI personnel. I was not disturbed by such disagreements. From the point of view of the senior person in the Internal Audit Department, I did not believe that senior BofI personnel or the Audit Committee acted in a way or took an approach that was illegal or jeopardized the safety or soundness of BofI.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 9, 2015 in San Diego, California.

_____
Jonathan Ball